HENRY STUCKY

*v.*

A. CATHARINE STUCKY, executrix, &c.

A. conveyed land to B. The latter subsequently sold it to C. A., by his bill, alleged and sought to establish an express trust in his favor in the consideration money of the deed from B. to C. The proof

failed.—*Held*, on the ground of variance, that he could not, under the bill, recover the money by proof that the conveyance from him to B. was merely voluntary. If the conveyance was merely voluntary, no resulting trust would arise therefrom.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. W. H. Hagaman* and *Mr. C. Borcherling*, for complainant.

*Mr. J. R. Emery*, for defendant.

THE CHANCELLOR.

The bill is filed to compel the performance of an agreement which the complainant alleges that Jacob Stucky, his brother, now deceased (he died after the bill was filed), made with him, in 1871, to hold in trust for him certain money, $3,400, and a mortgage for $10,000, and interest respectively, paid and given by John O'Rourke to Jacob for the consideration of the conveyance by the latter to the former of a tract of land of thirteen and one-half acres in Essex county. The bill states that the complainant was, on or about the 16th of August, 1870, seized of the land; that it was purchased by him from Josiah F. Dodd, in 1853, and was conveyed to him by the latter by deed dated January 10th, in that year; that he then entered into possession of it, and that from that time up to the time of the date (August 16th, 1870) of a deed for it given by him to Jacob, he remained in possession of it and improved it, so that, by reason of his improvements and the rise in value of real estate, it had, when he conveyed it to Jacob, become worth $13,400; that Jacob had been very desirous of buying the property from him, and had frequently applied to him to sell it to him, but that he had refused to sell it to him separately, but had expressed his willingness to sell it to him with the adjoining tract of seventeen acres belonging to the com-

plainant, at the price of $35,000 for both, but Jacob refused to pay that price; that the complainant was then sixty years old, by birth a German, and by occupation a farmer; that having mingled but little with the world, and being ignorant of the requisites of legal business, and the formalities attending it, and having but little knowledge of the English language, and being unable to speak or read it understandingly, and being in the habit of consulting his brother Jacob who, on the other hand, was a man of business in Newark, he, in August, 1870, in view of the fact that his wife was confined to her bed with severe illness, and his own health had become seriously impaired, applied to Jacob, and requested him to attend to the drawing of the complainant's last will, informing him of his wishes as to the disposition of his property; that Jacob thereupon promised to attend to the business for him, to have the will drawn, and to bring it to him to be executed; that a few days thereafter Frederick Stucky, a son of Jacob's, and Herman Ise, then one of the judges of the court of common pleas of Essex county, called at his house on the property, and presented a paper to him for his signature, and requested him to sign it, but neither explained it nor informed him of its contents, and he, believing it to be the will, and assuming that it had been drawn in accordance with his directions, signed it, as did also his wife, who was then requested to do so.

The bill adds that his wife was then confined to her bed, and was at the point of death, and he was in a weak and enfeebled condition, both of body and mind, and unable to transact or understand any matter of business. It further states that he, on or about the 30th of June, 1871, contracted with John O'Rourke to sell him the tract of thirteen and a half acres, and that they went together to Jacob's store in Newark, and the complainant then and there informed Jacob that he had sold the property to O'Rourke, and that then, to his great surprise and amazement, Jacob produced a deed for the property from the complainant and his wife to him, duly executed and acknowledged, convey-

ing the premises to Jacob in fee-simple, and thereupon Jacob claimed to be the owner of the property under the deed; that the complainant then declared that the deed had been obtained by fraud, and denounced Jacob for having taken advantage of his confidence; and the bill states that that was the first knowledge or intimation the complainant had had of the existence of the deed, and that he then requested Jacob to give it up to be cancelled, but Jacob refused to do so.

The bill further states that the complainant being desirous of carrying out his agreement with O'Rourke, to whom he had sold the whole of the property to which he claimed title, both the tract of seventeen acres and that of thirteen and a half, and Jacob proposing that he should be permitted to convey the thirteen and a half acres to O'Rourke, and promising that he would hold the money and securities which he should receive for the consideration in trust for the complainant, the latter was constrained to consent, and did consent accordingly; that Jacob conveyed the property to O'Rourke, by deed dated June 30th, 1871, and received from him $3,400 in cash, and a bond and mortgage on the premises to secure the balance ($10,000) of the purchase-money, with interest, and that Jacob refused to pay over the money, or deliver the bond and mortgage to the complainant. The bill prays that Jacob may be declared to be the trustee of the complainant with respect to the money and securities received by him for the consideration, and may be directed to pay over the money and deliver the securities to the complainant; or, if the latter be impracticable, then that he be required to pay the amount of the principal and interest thereof instead.

The answer was filed in the life-time of Jacob Stucky. It states that the property was bought by him in 1853, for the benefit of his brother, the complainant, who had then but lately emigrated to this country from France; that, though the deed was made to the latter, it was under the express agreement that he would, on request, convey the property

36

to Jacob; that Jacob paid all the purchase-money ($435.35),
and it claims a resulting trust accordingly. It further
states that, though the property had risen in value, the rise
was due, not to any improvements put thereon by Henry,
but to the speculation in lands in that vicinity. It denies
that Jacob ever offered to buy the property from Henry,
and denies all the facts on which the equity of the bill is
based. It expressly and explicitly denies the allegations of
the bill in reference to the circumstances under which the
deed from Henry and his wife to Jacob was made, and states
that the deed was executed in pursuance of an agreement
between Henry and Jacob that the property should be con-
veyed to the latter, and it denies that the promise alleged in
the bill (that Jacob would hold the money and securities
received from O'Rourke for purchase-money in trust for
Henry) was ever made.

The proof is, that Henry came to this country from France
in 1853, and, as far as appears, he had but about $80 at that
time. The tract of thirteen and a half acres was bought by
Jacob, as Josiah F. Dodd, the vendor, testifies, for Henry,
and the deed was made to the latter by Jacob's direction,
but the purchase-money was paid by Jacob. It appears,
too, that when this tract was bought, Henry had already
bought the adjoining tract of seventeen acres before men-
tioned. How much he agreed to pay for it, or with what
means he paid for it, is not in the evidence. That he occu-
pied the tract of thirteen and a half acres up to the time of
the sale to O'Rourke, is not denied. The improvements
which he put upon it, however, appear to have been of no
great cost. They consisted in fencing, draining, &c. That
the complainant did not claim to be the owner of it, appears
from the testimony of O'Rourke, who says that he made the
bargain for the purchase of the property with Henry, and
that he and Henry then went to Newark to see Jacob, at
the suggestion of Henry, who said that he could not sell
that property until he should see his brother; and the wit-
ness adds, that he thinks he said that the property belonged

to his brother. It appears clearly and incontestably that Jacob was at that time, and had been for about a year, the holder of the legal title to the property, under a deed in fee executed by Henry and his wife to him, by which, for the consideration of $25, as therein expressed, they conveyed the property to him. That deed was dated August 16th, 1870. It was acknowledged before Judge Ise (who drew it by direction of Henry and Jacob), on the 20th of that month, and it was recorded on the 19th of November following.

Though Henry, in his bill, states that he was greatly surprised and amazed when he found that Jacob had a deed from him for the property, and alleges that the first knowledge or information which he had of the existence of the deed was when it was shown to him on the occasion when he and O'Rourke went to see Jacob, which was in the summer of 1871, and declares that he supposed, up to that time, that the instrument which he and his wife executed at their house, in the presence of Judge Ise, was his will, it is not only clearly proved that he gave directions for the drawing of the deed, but that he was fully made acquainted with the contents at the time when he executed it. The statements of the bill as to the condition of his own and his wife's health are shown by the evidence to be untrue. By the testimony of Judge Ise, it also appears that there is no reason whatever for believing that the complainant could have supposed that the instrument which he executed at his house was his will, for Judge Ise testifies that the complainant himself gave him instructions for the will, and that it was signed, not at the complainant's house, which was in the township of Orange, but at the judge's office in Newark, and that one Caspar Friederich, of the latter place, witnessed the signing, with the judge. In this connection it may be remarked that the complainant's statement in the bill as to his want of knowledge of business, is not only not sustained, but is shown to be untrue by the testimony and the facts in the cause. Notably by the circumstances that he

alleges and it appears that he conducted the negotiation with O'Rourke for the sale of the entire property occupied by him, selling and conveying the tract of seventeen acres for the price of $25,500, and negotiating the sale of the other at $13,400. Moreover, he conducted the negotiations with O'Rourke in the English language, notwithstanding his allegation that he cannot speak that language intelligibly. The complainant presents, in support of his allegations, the testimony of Augustus F. Spaeth, who swears to conversations between himself and Jacob Stucky in regard to the deed for the tract of thirteen and a half acres. This witness was the son-in-law of Jacob Stucky, and appears to have interested himself in the business of the latter up to the time of the latter's death. He seems to have taken an active interest in the defence of this suit up to that time. He speaks in his testimony of his activity in getting in the answer, which was sworn to only a day or two before Jacob Stucky's death. He appears to have been anxious that it should be put in by Jacob Stucky, and to have been apprehensive lest by delay the opportunity should be lost.

After the death of Jacob Stucky, and on the 30th of December, 1876, he presented a bill against his estate of between $1,500 and $1,600, of which he says $1,000 were for his services and advice in Jacob Stucky's business (he is not a lawyer), including the defence in this suit. On the 18th of November, his examination as a witness for the complainant began, and it was ended on the 19th of January following, so that the bill just referred to was presented during the time covered by his examination. He admits that he gave to the complainant's solicitor information in reference to the subject of the suit. On that head he testifies as follows: " *Q.* Are you assisting, or have you in any way assisted him (the complainant) in carrying on this suit? and, if so, how? *A.* I have given his attorney part of the information he wanted. *Q.* Well, what else? *A.* That is all, as I consider it; I am assisting in no other way.

*Q.* Did you give this information to his attorney for the purpose of assisting him in his suit? *A.* That is the only way I took it; I think that was what I meant. *Q.* Then you meant to destroy the effect of Jacob Stucky's answer? *A.* Yes, in reference to Henry Stucky's putting money in my hand; I had known him a long time; my wife was a niece of his; he had entire confidence in me; I think the amount of that money was a couple of hundred dollars; he insisted that it should simply be left with me, and I would not have it in that way." No explanation of this $200 transaction is given. It may be added that the testimony of this witness in regard to the circumstances of the swearing to the answer, is flatly contradicted by the solicitor who had that matter in charge, and the master by whom the affidavit was taken.

But, further, his testimony is intrinsically unreliable. He swears that Jacob Stucky, a few days after the deed from the complainant to him was made, told him that he had received a deed from the complainant for certain woodland (the tract of thirteen and a half acres); that he asked him how he got it, and Jacob said that Judge Ise and Frederick (meaning his son) had gone to the complainant's and got it without trouble, &c. He also says: "He (Jacob Stucky) also spoke of a mortgage which had then been made, and asked me how he could control a mortgage which had been made to Henry (the complainant) for $20,000." But, in fact, the $20,000 mortgage had not then been made, and was not made until nearly a year after that time. The deed to Jacob was acknowledged, as before stated, on the 20th of August, 1870. The deed to O'Rourke, who gave the $20,000 mortgage, was not made until June 30th, 1871. The witness, therefore, must be mistaken when he says that Jacob Stucky, a few days after the deed from the complainant to him was made, spoke to him about the $20,000 mortgage.

There are other considerations, also, which are decisive of this suit. The bill is filed merely to establish a trust in

the purchase-money of the tract of thirteen and a half acres, not to set aside the deed. There is no proof whatever of the alleged trust, and the answer explicitly denies it. If the deed to Jacob be regarded as merely voluntary, in view of its nominal consideration, no trust results therefrom. *Hill on Trustees* 106, 107; *Perry on Trusts* § 362; *Osborn* v. *Osborn*, 2 *Stew.* 385. But the bill does not even allege that the deed was voluntary. It alleges that it was fraudulent. It is enough to say that the complainant must abide by the case made by the bill. He stands or falls with it. *Marshman* v. *Conklin*, 6 *C. E. Gr.* 546; *Midmer* v. *Midmer*, 11 *C. E. Gr.* 299; *Hoyt* v. *Hoyt*, 12 *C. E. Gr.* 399, *S. C. on appeal*, 1 *Stew.* 485; 1 *Dan. Ch. Prac.* 328; *Montesquieu* v. *Savidge*, 18 *Ves.* 302.

The bill will be dismissed, with costs.