## CATO v. EASLEY.

1. A party may it seems, in Chancery, be joined as defendant for purposes of discovery merely.
2. Minors, defendants in Chancery, having been admitted to make full defence by their general guardian, the revising Court will consider the sanction given to such mode of defence, as equivalent to an appointment of a *guardian ad litem.*
3. A voluntary settlement in favor of children, set aside as fraudulent, as against an existing creditor, under the circumstances.
4. The statute fixing a time within which minors can impeach a decree rendered against them, it is no error that a time is not fixed in the decree for that purpose.

IN a bill in Chancery filed in 1824, by Roderick Easley in the Washington Circuit Court, against Lewis Cato, the following facts were charged, viz: That one Wyche Cato died intestate, leaving his widow, Martha Cato, and four children, Burrell, Feraby, Franklin and Green, who were minors; that he left a considerable real and personal estate; that Lewis Cato administered; that at a sale in July 1817, of a part of the property, the widow purchased to the amount of $773 12, and gave her note to

the administrator for that amount, payable in six months, which the complainant signed as her security, because as he alleged, there yet remained property in the hands of the administrator undivided, her portion of which would be sufficient to satisfy the debt due by her, as he believed; that by a distribution of the property, she received among other things two slaves, Rodah and Sarah, which Lewis Cato, the administrator, delivered to her; that she afterwards intermarried with one J. H. Irons, but before so doing, she, by a voluntary deed, conveyed the negroes, together with other property, to the four children; that afterwards she died, and after her death, Lewis Cato, as guardian of the children, took possession of the two slaves, Rodah and Sarah, for their benefit. He further charged, that after the lapse of a considerable time, in April 1821, Cato, as administrator, brought suit against him on the note, and that he recovered in Marengo Circuit Court, in April 1822, judgment against the complainant, for $598 50 debt, $28 77 damages and costs; that complainant believing the claim unjust, resisted it, and obtained an injunction to stay the collection of it, but was compelled to pay for the debt, interest, damages and all costs $858 31, as shewn by documents exhibited. The bill alleges, that the convey-ance of the two negroes and other property by Martha Cato to her children, made when she owed the note to the estate, and without reserving property to satisfy the debt, was a fraud in law, and that they were subject in the hands of the guardian to satisfy the complainants claim; that Lewis Cato for the benefit of the children, was in pos-session of the negroes, of the property for which the note was given, and also of the money collected of the com-plainant, all which was subject to distribution among them. The complainant prayed that Lewis Cato might he made defendant as administrator, and also as guardian to the children, that he might make full discovery of all the matters charged, of what property the widow received, what her dower was &c. &c. And that the property of the minors in his hands, or so much as was necessary, might be made liable to reimburse the complainant &c. *

The children answered by Cato their guardian, and Cato answered also in the character of administrator. The answer on behalf of the infants, states that they are strangers to the matters of the bill; they admit that their

* It appears a demurrer was filed by the defendants to the bill, but the record does not shew the particular disposition of the demurrer.

mother, previously to her marriage with Irons, and with his knowledge, and at his request, conveyed to them the two slaves and her distributive share of the personal estate, except the stock of cattle and hogs, with a view of placing said property beyond the control of her intended husband; and insist the deed was made *bona fide*, and not with intent to hinder or delay creditors; and being infants, they pray the full benefit of their rights. In the capacity of administrator, Cato answers, admits the making of the conveyance, but denies the intent to defraud either Irons or her creditors, and says that the deed was made *bona fide*, with the assent of her intended husband, and at his request, to prevent the property from being subject to his control, or to the payment of his debts. He answers further that Wyche Cato died seized of 250 acres of land, which rented for $210 per annum, out of which said Martha Cato was dowable, and that in her lifetime she received her distributive share of Wyche Catos' estate, with the exception of about thirty dollars; that Irons, during the marriage, sold cattle which he acquired by her for about $800; that when she made the deed she was in perfect solvent circumstances; and admits that the property conveyed in the deed was delivered to the minors. The defendants also insisted by way of demurrer, on the insufficiency of the bill.

At April term 1827, the cause was tried in the Court below, as the decree recites, on the bill, answer, exhibits, and proofs refered to in the complainants' bill; when, by the Chief Justice, a decree was rendered, subjecting the slaves Rhoda and Sarah to the reimbursement of the complainant of the debt, damages and costs recovered by Cato against Easley, amounting to $899 17, and interest thereon; and ordering the sale of the negroes, unless Cato the administrator should pay the amount; and also that the defendants should pay the costs of suit. *

This decree, Cato insists is erroneous, and to reverse it, he sued a writ of error to this Court.

SALLE, for the appellants. The object of the bill is, either to set aside the deed conveying the two negroes to the minors, and subject them to the re-imbursement of the money paid by Easley; or to discover what other property Martha Cato would have been entitled to, wheth-

---

* In the decree it is recited that it appeared the slaves were purchased at the sale, and that the note was given for them.

er real or personal, upon a full and final distribution of the estate, that it might be subjected in like manner.

The objections to the bill, and which were available on demurrer, are:

1. That the minors are not made parties. All persons interested and within the jurisdiction of the Court must be made parties. The bill should be filed against the minors as against all other persons, and should have prayed the Court to assign them a guardian *ad litem*. Instead of this, the bill was filed against the administrator, who was their guardian in socage.

2. Lewis Cato, as administrator, was improperly charged. As such, he was not liable for any debt contracted by the widow, and no decree should be had against him. If a discovery of the amount of Wyche Cato's estate was the object, it should have been sought of the minors, and the administrator examined as a witness. But at all events, as the discovery shews he had effects as administrator only to the amount of thirty dollars, no decree should be rendered against him for any greater amount. Again, if made a defendant for purposes of discovery merely, when he made such discovery, he should be discharged and allowed his costs.

3. James H. Irons, having married the widow, he took her *cum onere*; the bill shews her liability, and he should have been sued as her husband, by the complainant. But even in this proceeding, she should have been made a party, or her husband as her administrator.

But on the discovery made and the answer, as the cause stood on the bill and answer, and the answer denying all fraud and the equity of the bill, it was error to decree against the answer, unless disproved by two witnesses, or one witness and corroborating circustances. [a] The question is, was the conveyance fraudulent as to creditors? It is denied that the deed was made *mala fide*, or with intent to defraud creditors or any one else; it was with the assent of the future husband, and on good consideration. As to the insolvency of Martha Cato, when she made the deed, so far from this being the case, it appears that her husband Irons received by her cattle, which he sold for. $800. The answer alleges she was solvent. It appears she was entitled to dower out of real estate, worth $210 per year; even at the filing of the bill a balance of $30 was yet due her from the estate. The conveyance was an ante-nuptial one; true it was voluntary, but volunta-

[a] 9 Cranch,
2 Fonb. Title
Discovery.
7 John. Ch.
Rep. appe'

JULY 1829.

Cato
v.
Easley.

a 2 Cowper
707.

b Also Roper Prop. 305, 307, 310.

c 3 John. Ch. Rep. 367. John. Dig. 271. 1 Atk.

ry conveyances are not fraudulent because they are voluntary; they are void only if fraudulent. What then are badges of fraud in such cases? Nothing but the insolvency of the party will avoid a voluntary deed, or such an indebtedness as can leave no doubt upon the mind, of the intention of the grantor to defraud. The answer shews the indebtedness of Mrs. Cato not to be such. In *Dole v. Roulledge,* [a] Lord Mansfield thus expresses himself: "The statute does not say a voluntary settlement shall be void, but that a fraudulent settlement shall be void. It is laid down in a case by Hale, that a voluntary settlement may be good, and the cases cited from Talbot and Wilson, support that doctrine. I remember a case before Lord Hardwick, where a woman was possessed of an estate, and having children by a former husband, was about to marry again; but before she married, and because she was going to marry, she made a voluntary settlement of her estate upon her children. Her second husband afterwards persuaded her to join in a sale of this estate for a valuable consideration, and the question was, whether this settlement was void? The Court held that her doing a rational act, without any intention of fraud or of defeating any body, would not render the settlement fraudulent, though it was absolutely voluntary. The name of this case was *Newstead v. Searle.*" Lord Mansfield, a little further says: "One great circumstance which should always be attended to in these transactions is, whether the person was indebted at the time he made the settlement." The question here recurs, indebted to what amount? The books all declare that the party must be insolvent, for every man owes his daily bills. The cases are all carefully collected in Newland on Contracts, to which I refer. [b]

The decree is certainly erroneous as to the amount. Easley says he obtained an injunction, which was dissolved; the original amount of the judgment was $598 50 debt, $28 27 damages, and $15 costs; this was increased to $858 31 by the wrong course adopted; so that now the appellant has been decreed to pay upwards of $1250, besides costs. It is contrary to equity to charge the appellant with an accumulation occasioned by Easley's errors.

No time is fixed by the decree within which the minors are allowed to impeach it; this is error. [c]

Parsons and Lyon, for the appellee. All the parties which the forms of the law require, are before the Court; the decree ascertains the facts as appearing by proof, as

alleged in the bill, and they are sufficient to sustain the decree. Lewis Cato was guardian to the children, and the objection made on this ground is mere matter of form; he was also the administrator, he credited Martha Cato; he delivered to her the proportion she was entitled to of the estate, instead of retaining so much as was necessary to pay this debt; he received the negroes for which this debt is contracted; and he undertakes to compel Easley, her security, to pay the debt; so that he holds the money and negroes both, to be distributed to the children, his wards. This is certainly not allowable in equity. He is liable to refund as far as the value of the negroes extends, and no one can be injured by it.

By JUDGE COLLIER. So many of the points presented by the assignment of errors as it is deemed material to notice, may be thus succinctly stated.

1. Could the administrator of Wyche Cato have been properly made a defendant to the bill of the appellee?

2. Should the wards of the appellant have defended by a guardian *ad litem*?

3. Is the deed of gift made by the mother, who was largely indebted at the time, as against existing creditors, void *per se*?

4. Was it necessary to have expressed in the decree, a time when the infants, on attaining full age, should be permitted to impeach it.?

5. Is not the decree rendered for too large a sum?

The first point makes it necessary briefly to state the facts. Wyche Cato, the father of the wards of the appellant died intestate, possessed of a considerable real and personal estate, on which the appellant administered. A part of the estate was sold by the administrator, and purchased by Martha Cato, the mother of the wards, and widow of the intestate, who made her note therefor with the appellee as security, payable six months after date. After the making of the note, she conveyed her property, without any valuable consideration, to her children, and the appellee has been compelled to pay it with interest and costs. To reimburse himself this suit was brought, to subject the property thus voluntarily conveyed, to the payment of this demand.

Perhaps it was unnecessary to have made the administrator a party to the bill, unless a discovery was sought from him for some purpose. It does not appear whether

JULY 1829.

Cato
v.
Easley.

JULY 1829.

Cato
v.
Easley.

the obligations of the appellee, which it was essential to prove in order to a decree in his favor, could have been proved without the benefit of his answer. The bill merely shews, that by written testimony the appellee could have shewn the amount paid by him, but not that he could prove that he was the security of the mother. And for any thing appearing to the contrary, the administrator may have been a party, that a knowledge of that indispensable fact might have been acquired by his answer. Be this however as it may, the decree of the Court below cannot be affected by it, as there is no decree against the administrator as such, and in that character he has no right to complain of it.

The record does not make it necessary for the Court to decide in this case the abstract question, whether infants should defend by a guardian *ad litem* where they have a general guardian. The names of all the infants are set out in the bill; their names and the name of the appellant as their guardian, are recited in an order made by the Court upon the bill, and before the coming in of the answer; they all profess to answer by their guardian in usual form. From these facts appearing on the record, the Court might infer that the appellant was either appointed as their guardian to defend this particular suit, or if not appointed, that he was recognized as such, which may be considered as tantamount to a special appointment. In Virginia it has been holden, where a suit against infants in Chancery was defended by a guardian appointed by the County Court, and the answer of the guardian was received for them, and full defence made under the sanction and authority of the Court, that the infants were equally bound by such defence, as if their guardian had been appointed in form *ad litem*, by the Chancery Court. [a] This decision we have no hesitation in recognizing as law. Again, if the appellant had no authority to defend for the infants, the objection, we are inclined to think, should be taken by them on attaining full age, and not by the appellant now, because he would have no right to bring their case into this Court, for want of the authority of which he complains.

It is a well established rule of the common law, that all conveyances made with an intent to delay, hinder and defraud creditors, are fraudulent and void, and our statute of frauds and perjuries is declaratory of it. [b] And it is a legal inference, that a voluntary settlement or conveyance

[a] Beverleys v. Miller, 6 Munf. 99.

[b] Laws of Ala. 244.

made by one indebted at the time, is, as against such creditors, fraudulent, and absolutely void. It appears that the debt which was paid by the appellee, and for which he seeks an indemnity, was existing at the time of the conveyance, though not in his hands. The effect of the payment by the appellee as security for the mother, was not an extinguishment of the equitable lien which the administrator had on the property conveyed; at law the debt was extinguished; in equity it is continuing; and the appellee is considered as standing in the same situation in regard to the property conveyed, as the administrator did; and every facility which he had in equity for the collection of the debt, was transferred by the payment, to the appellee. The doctrine in relation to voluntary conveyances is very fully considered in the case of *Reade v. Livingston and others;*[a] The learned Chancellor collects and reviews the most prominent of the English adjudications upon the subject, and maintains, that a conveyance without valuable consideration, by one indebted at the time, is fraudulent in law against existing creditors, and that the intention of the donor determines the validity of such conveyance, as against subsequent creditors, which intention must be ascertained by the circumstances accompanying and following the conveyance. In Wheaton's Reports and Johnson's Chancery Reports, the same doctrine is recognized.[b]

With regard to the objection that no time is expressed in the decree when the infants shall impeach it on attaining full age, it is enough to say, that the statute prescribes the time; and that therefore it need not be repeated in the decree.[c]

The decree is for a larger sum than appears to have been due the appellee. For that cause it must be reversed, and rendered here for the sum which seems to have been due, including interest, and the costs of the suit of Wyche Cato's administrator against the appellee; * to be collected by a sale of the property described in the decree, if it be not sooner paid; and the appellee must pay the costs of this Court.

<div style="text-align:center">Decree reversed and cause remanded.</div>

* The decree was rendered for $971 01.

<div style="text-align:right">
JULY 1829.

Cato
v.
Easley.

a 3 John. Ch.
Rep. 481.

b 11 Wheaton
199. 8 Wheat.
242. 4 John.
Ch. Rep. 450.